Turn to the second case on our calendar, Daniel Lattner v. Mount Sinai Health Systems. Mr. Burke, go ahead. May it please the Court, Alex Burke for Daniel Lattner. The FCC and the FTC receive scores of complaints about automated calls and texts, more than any other category. May I interrupt you? Yes. Why is it not to the advantage of your client to be warned about having a flu shot? You're trying to help him so he won't die. Well, Your Honor, I don't think that flu shots are designed to help— How is that an invasion of privacy? I'm sorry? How is that an invasion of privacy? Well, in 1991, Congress passed this law that says you're not allowed to send automated messages unless you've got consent. And I guess the answer to your original question, why doesn't the plaintiff want to know about flu shots, the answer is, well, he might have. He might want to know about flu shots. And if he wanted to know about flu shots, then he would have consented to receive flu shots. But that's not what we have here. But it is clearly a reminder text message, right? Healthcare message under the FCC's regulations? I think it is a healthcare message under the FCC regulations, and I think the parties agree on this. And so because it's a healthcare-related message, it's the regular prior express consent standard that applies rather than the prior express written consent standard. And I think that's where the district court erred. It's difficult to understand what the district court was saying, but what the district court said is that because written consent doesn't apply, the plaintiff loses. And, of course, there should have been a second step to that analysis, which was, well, what happens under regular consent, regular prior express consent? Well, so your client provided his phone number. He did. And why isn't that enough? Well, because you have to look at the context in which the phone number was provided. He provided his phone number in 2003 during a general wellness visit, a visit where he declined receiving immunizations, and the text message was sent 11 years later. There were no text messages sent in the interim time, and the original visit in 2003 had nothing to do with flu shots or text messages. As I understand it, and correct me if I'm misunderstanding, we look at the facts and circumstances of each situation with regard to you gave your phone number. That doesn't necessarily mean you can keep bombarding people with text messages, but we look at the facts and situation. Well, he went to his doctor. He wasn't being bombarded. He only got one reminder about the flu shot. Is that an appropriate circumstance that I can take into account, that it was in connection with health treatment, health services, and it was not repeated harassing number or character of messages? Well, I think that the reason that we don't have mass amounts of text messages here is because of the TCPA. The TCPA restricts these messages. And, you know, although there's no expiration of prior express consent, there's no time limit to consent, what you have to do is look at the facts and circumstances. We've got a text message that's sent 11 years after original provision of the number. Provision of the number, unlike the Safeway case and the Rite Aid case, had nothing to do with flu shots. In fact, flu shots were, well, immunizations, we know, were declined during that original visit. Just the mere fact that the original provision of the number had to do with health care isn't enough. I still think that had he gotten a flu shot 11 years earlier, that wouldn't necessarily provide prior express consent in 2014 to receive a flu shot reminder call. In fact, and Your Honor touched on, you know, the fact that there's just one message here. You know, the intake forms that we're looking at here promise the plaintiff on the original form at A130 that the information would only be used for payment, treatment, and hospital operations. Flu shot reminders, 11 years after the fact of provision of the phone number, does not constitute a payment, a treatment, or a hospital operation. What they're trying to do is bring patients back into their doctor's office. And that form, if I'm understanding it correctly, also doesn't say, we'll call you about this. It says, we'll use your information. It doesn't say anything about calling. Right. But it is also the case that later on in the form, it does include a notice that his information may be used to recommend possible treatment alternatives or health-related benefits and services. Yeah. I mean, we agree it says that. But I think that that sentence has to be looked at in the context of the document package as a whole. I mean, on A130, the defendants promise that they'll only use the phone number or the information for payment, treatment, and hospital operations. Those three uses are repeated throughout the paperwork. And then deeper in the paperwork, we have an alleged expansion at 139, A139, to use the information to recommend health-related benefits and services that may be of interest. And when I began my argument, I was going to go into the technology disparity between putting together a rote message that you provide a credit card and you can send out 50,000 messages in a single day. You can do it the same day you decide to do it. Whereas receipt of each of those messages has to be answered individualized. There are 50,000 people who get those messages. It interrupts their day. It interrupts legitimate business phone calls, personal phone calls. It distracts them from their lives. That non-individualized nature of the messages lends itself to this situation where you have a plaintiff or a consumer who declined immunizations originally, and now you've got, 11 years later, his doctor, who's supposed to be recommending medical treatments that are specific to him, recommending that he get something. Well, I don't even think it's a recommendation. Flu shots aren't right for everybody. People who have allergies or are otherwise sick aren't supposed to get flu shots. This blast flu shot was sent to everyone who had visited this health care clinic in the prior two years. So the language of the provision that the defendants rely upon talks about recommending. And I think recommend from a doctor is a term of art. And I would submit that sending a blast message about flu shots is not a recommendation, particularly where the sender has the information about whether these particular people want or should get a flu shot. I'll reserve the rest of my time. May it please the Court. I'm Stuart Gerson on behalf of the Applees. It's significant to note that this case relates to a single text message that was sent to the plaintiff in the year 2014. That's a time that makes all the difference, although in post-2014 law you'd get the same result for some slightly different reasons. But because this related to conduct that occurred in 2014, Judge Hellerstein was absolutely right in ruling the way that he did. If one assumes, as apparently has just been conceded and has been throughout, that this is a health care message, of course it's a recommendation. You can't demand that somebody get a flu shot, only that he or she consider it. Flu has killed millions of people since the virus has been discovered, and the pandemic doesn't come around every year. It comes around every once in a while. Although I do note that there's not an 11-year gap in the time of this patient. While his original visit was in 2003, as the district court noted, he went back in 2011. So there's an ongoing relationship. This particular message was sent conjunctive with the flu pandemic in 2014. In 2014, if you had a health care message, that was absolutely exempt from consent requirements. It was only in 2015 that the FCC changed its rule and had the provision that a plaintiff keeps saying that the judge below missed, involving a stop provision and a denial. That didn't obtain at the time this message was actually sent. So Judge Hellerstein was absolutely correct, and I could stop there, but even if the plaintiff were right that the law should somehow be applied retroactively or the regulation applied retroactively, I would note several things. First, there was prior expressed consent in two regards, and both the courts and the FCC have recognized that health care is a great exception. This is not a telemarketing situation where people are being bombarded with calls for phantom land sales by the lake in the woods. This has to do with health care, and because that's so, the FCC and the courts have concluded in this context that giving your phone number constitutes prior consent. Why wouldn't it? The idea of giving a phone number implies that you can be called or texted to your phone number. But in addition, as has been noted earlier, there also was a writing, a signature, on the receipt of the Notice of Privacy Practices, which talks about treatment modality and health care. I mean, that's what this is. What could be closer to the definition? He signed that writing? Yes, sir. But as he points out today, the writing doesn't say, you're going to use this information that I'm sharing with you to text me. It doesn't expressly, it doesn't refer to being contacted. Well, I think you need to look at the two things in conjunction. The fact that he's given the telephone number certainly implies nothing but the possibility of being contacted. This goes beyond that. Same number for 11 years? Apparently so. Even if there wasn't prior express consent, this text would have fallen into the emergency purposes exception, which still exists, and in the health care context has been very leniently applied by both the FCC and the courts, as we've cited in our briefs, to include things like the pharmacy calling saying, pick up your prescription, or truancy notices from schools, where is your child. The tolerance level is pretty low with regard to that. So that's a third basis for consent? Well, it obviates the need for it, Your Honor. Beyond that, in addition, to go to one of the questions that was asked earlier, is this specifically mentioned, the test is closely related, and again, in the health care context, it is very generously applied. And one would argue, as was pointed out in the initial question that was asked, this is a serious matter. Now, one can choose to get a flu shot or not, but one certainly ought to be given the opportunity to consider getting a flu shot when there is the potential for fatality. It is the case, and I realize this call was made beforehand, so we don't look at the March 2015 regulations, but as a policy matter, the existence of that regulatory regime does suggest that there's been a determination that even within health care, there should be some regulations in place to avoid, to permit proper calls to come through, but to avoid harassing calls. Am I wrong about that? Yes. With due respect, I think you are. I mean, it adds a necessary clarification. However, it's been very clear, both in the rulings of the FCC and the various courts that have taken this up, that that 2015 clarification has not obviated the availability of the easier test, the emergency treatment test. Am I right in understanding that one principle change for that new regime is to just afford the consumer an ability to say, stop contacting me? That's right. In the communication itself. That's right. Here, I mean, in a practical sense, while it doesn't matter in terms of when the law was effective, here it really doesn't matter at all because there was only a single message. So stopping is an irrelevancy, isn't it? I have nothing further if Your Honors have no further questions. We would submit that the judgment below should be affirmed. Mr. Burke. Thank you. Judge, the law, Your Honors, the law in 2014 was that you couldn't send these messages. I hear something different at oral argument than what I read in the papers. Prior express consent was definitively defined by the FCC in its 2008 debt collection opinion where it limited provision consent to where you provide the number as part of a transaction. Consent only exists for text messages or phone calls having to do with that transaction. That was the law in 2014. There was an intervening rulemaking that the FCC did in 2012, but the intervening rulemaking had to do with residential calls and it said that you didn't need written consent for these health care messages. The suggestion that these messages were permissible under the regular consent standard in 2014 because of the 2012 order is wrong. On the emergency issue, emergency is different than consent. So they are two independent reasons why a message might be allowed. And when you're looking at emergency, you have to look at whether the text messages were necessary. And what the FCC... The exact language is calls made necessary in any situation affecting the health and safety of consumers. Right. So what we're looking at is if there's a forest fire or if there's a school shooting. I would submit that a missing student, a truant student or a missing student is an emergency. They're looking for this child. That's the kind of emergency we're talking about, not something where you could send a postcard to your customer base or your patient saying, hey, listen, flu shots are available. That just takes two days. What has to happen for emergency is an exigency that necessitates the use of this immediate method of communication. I see my time is up. If there are no further questions, thank you. Thank you, Mr. Burke, very much. Both sides, thanks. Travel safely, both. Thank you.